The first case is Odeon Capital v. Brett Ackerman. We'll hear from appellant. Thank you very much. Good morning, your honors, and may it please the court. My name is Mark Knoll from Bressler, Amory & Ross, here on behalf of Appellants, Odeon Capital Group, Matthew Van Alstine, and Evan Schwartzberg. We asked the court this morning to vacate the order confirming the arbitration award and remanding this matter to the district court for an evidentiary hearing. We do this fully cognizant of the deference afforded arbitration proceedings. But here, this appeal is not based on a challenge to the conduct of the arbitrators or their factual or legal findings or conclusions. Instead, this appeal focuses on section 10A1 of the Federal Arbitration Act or the conduct of parties to an arbitration proceeding. We, well, I'll let you continue, discuss the conduct that you find reversible. Absolutely, the conduct itself was the perjures, the statements made by Mr. Ackerman during the course of the arbitration proceeding, which were, in fact, lies. We believe that we would be able to establish before the district court- If someone made a decision against you without making any explanation of it, you could have asked for an explanation. And if that explanation had in some way linked to these statements, that would be one thing. But since it didn't, aren't we bound to say that the arbitration stands if there is any way in which the arbitrators could have found that way? If you're dealing with the conduct of the arbitrators or the legal conclusions or factual findings of an arbitration panel, I would say that the Forsyth decision, which is the Fifth Circuit decision, would control that sort of outcome. But here, the answer is- You're saying that we should, we have control over the parties. But does control over the parties mean that we throw out the arbitration even if there is, under that ruling, nothing that says that the arbitration is bad? I completely understand Your Honor's question. The issue here is not whether we were able to establish during the arbitration proceeding that Mr. Ackerman lied about, again, the status of this investigation from FINRA and whether FINRA affirmatively told him that they found nothing wrong with certain of his trades. Now- So that's the extent of his lying. He didn't lie about the lost wages, which was the subject of the arbitration. Well, lying about the lost wages is inextricably intertwined. Why? Because the wage claim was completely subjective. Well, wait a second. Did his employer, was his employer entitled to not pay him if he had done an illegal trade under FINRA? Absolutely. Was? That certainly would have been the case. Absolutely. Is that an argument you made to the arbitrator? Well, the point was, we did not know that the statements were- If the bond trade had violated FINRA rules, forfeited all of his rights to compensation? If the bond trade had violated FINRA rules, the trade would have been reversed. That trade, of course. That trade was eventually reversed. That's not what I asked you. What I asked you was, if the bond trade violated FINRA rules, was he still entitled to compensation for other trades for which he claimed he had not been compensated? He could have been. Absolutely. Now- Okay. So then the legitimacy of the bond trade did not go to his entitlement to payment? It absolutely did. Because- How's that? You just told me that it didn't. Because whether he was to be paid on particular trades or not, whether he was going to be entitled to be paid on a trade with a particular client or in a certain sector of securities was an entirely subjective assessment based upon whether he had the relationship. His testimony was that he was entitled to $5.5 million. That was his claim at the- That's his claim. That was his, you say, his subjective testimony, and his testimony was he was entitled to $5.5. What did he get? The wage claim that was awarded was slightly more than $1 million, $1.1 million. So therefore, apparently the arbitrators didn't believe everything he said. That's true. There you go. So, so, so they made that determination. Now what, what do you think they did base it on? They didn't tell us because they don't have to and they're not supposed to under FINRA arbitration. But what do you think they did base it on? I think they based it on a subjective assessment of his credibility with respect to certain  But they judged his credibility. That's the point that Judge Wesley is making. They judged it. They found it wanting to the amount of about $4 million and awarded what was left. They judged his credibility, but in the absence of the truth about what FINRA told him or did not tell him about- About an issue that's not determinative of whether he's entitled to compensation. But it, it certainly goes to his credibility, which was emphasized at the closing by his counsel- It's a bad act that goes to, it's a bad act that goes to his credibility. I believe so. Absolutely. Now the, the issue here when, and perjury is different when it comes to dealing with whether a court should confirm an arbitration proceeding or not. Perjury taints the entire process. Would you agree that the arbitrators seem to have found him 80% a liar? That's incredibly difficult to assess. It is incredible. That is exactly right. It is extremely difficult to assess. And when it is difficult to assess, unless we have something which you didn't ask him to tell us about, we say, okay, you are the arbitrators and you did it. And unless you are saying that any time there is something wrong, we should throw out the argument that you're making, but that's a mighty strong argument. It didn't relate to the matter that was an arbitration. It did, actually, Your Honor. The test that's applied by eight other circuit courts is not whether the perjury or fraud ultimately affected the outcome of the arbitration. That is not the test that's applied in those courts. The test is whether the perjury or fraud relates to an issue in the arbitration. Perjury poisons the fountain of justice. The issue here is, to the extent the arbitration panel was not required under Fenner rules to provide a reasoned explanation for their decision. I'm sorry? They didn't ask for a reasoned decision. Both parties would have to ask for it, Your Honor. Correct. And 90% of the cases in Fenner that doesn't happen, and it would give one party an opportunity to essentially hold back. But nevertheless, there is no reasoned decision. I understand. But that doesn't mean that the court should infer, you know, reasons for the In other words, an arbitration We can infer regularity. You can. I think that when you're talking about a challenge to an arbitration decision that's based on, say, a factual finding or a conclusion of law, you are certainly able to assess whether the arbitration panel has information before it. in decisions of district courts, if there is perjury, we don't necessarily reverse the trial. You just said perjury poisons . . . very nice language. But even in a district court where we have much more supervisory authority, we don't reverse that. So why should we, in an arbitration, where it seems on the face of it that the person who perjured and where the link, if it is there, is possible but not determined? I would respond in two ways. First, let's remember how this came up during the proceeding. An arbitrator herself, one of the members of the panel, specifically asked Mr. Ackerman, is that FINRA proceeding, is the FINRA investigation still pending? Clearly indicative of the fact that she found it to be a material issue in the arbitration. Second, he responded . . . That's not clear. She asked the question. We would have to assume that because she asked the question, she believed that she needed the answer to the question. I think that's a fair reading, just the same as saying whether they found him 20 percent credible or 80 percent credible. The second point is, in response to that direct question from the arbitrator, again, a question that has to do with an investigation by a regulatory body into his trading, he answered falsely that the matter was not pending, and he didn't do it in a way that was equivocal. He didn't do it in a way that sort of couched it to say, I don't remember. I think it's not. He said no. And then he gilds the lily. Then he says, not only that, but I told FINRA about the trade that my employer was investigating, and they told me that there was nothing wrong with it. He had always linked the retaliation claim that he was raising with his wage claim. He had always done it. And by establishing or by telling the FINRA panel, I'm sorry, by telling the arbitration panel that FINRA made an affirmative statement to him that he had done nothing wrong, which we believe we will clearly be able to establish before the district court that it was a lie, again, we weren't given the opportunity to do an evidentiary hearing before the district court. By doing that, he assuaged whatever concern that arbitrator had about that internal investigation, about those bond trades, in a manner that could do nothing but improve his credibility or bolster his credibility on the wage claim. Did he know that the bond trade in question that he himself had agreed to reverse the bond trade and undo it? That was all part of the testimony. I mean, it was contested. But he just knew the conduct of which, and he conceded the conduct which was before the FINRA investigation, right? Well, no, he had not conceded that conduct at all. And the FINRA investigation was different. The FINRA investigation involved questions related to his affirmative statements to counterparties to Odeon, where he was essentially lying to them to bolster commissions that he would receive. It went beyond the bond trade. It did. It served as the basis for his termination. No, the FINRA investigation did not serve as an independent basis for his termination. No, I didn't say that. I apologize. You have an innate ability to not hear the whole question. Maybe I'm not being clear enough. The bond trade which precipitated his termination was not the only conduct being examined by FINRA. Is that right? That is correct. Okay, thank you. Your time has expired, but you are reserved two minutes for rebuttal. Thank you very much. We'll hear from counsel for Mr. Ackerman. Good morning, Your Honors. May it please the Court. My name is Janie Bialik from the law firm of Pashman Stein Walder Hayden. Here on behalf of appellee cross-appellant Brett Ackerman. Your Honors, what appellants ask for this Court to do is to hold that alleged misstatements made during an arbitration without any proof that those misstatements were knowingly false at the time they were made can serve as the basis for vacature of an award without showing any materiality on the impact of the award. And neither the law nor the facts of this case support such an unprecedented extension of a court's ability to turn over an arbitration award. We don't have a standard, do we, for materiality in this circuit? This circuit does not, but both the district courts of the circuit and many other circuit courts have formulated a test. And however it's phrased, whether it's related to a material issue in the arbitration or whether there's a nexus to the outcome of the arbitration, the essence of the test is the same. And that's because the test derives from Section 10A1 of the Federal Arbitration Act. And that states that the award must be procured by fraud. Procured by means, in the ordinary definition, as a result of. And that's why the nexus is tied to the ultimate award. So if he had lied about the wage claims, claiming wages that he wasn't entitled to, that would be material in this particular case, hypothetically? Certainly it would be material. But first of all, there's no showing that there was a lie at all. But even if there was a lie, it had absolutely no impact on the outcome of the arbitration. What do you say to counsel's last point, that the arbitrator asked about it? So it obviously was material to her. Well, this was cross-examination, and various topics were discussed. And the arbitrator asked about it, and Mr. Ackerman testified to what he believed at the time. And remember, at the time, he had testified before the FINRA in regards to the first OTR, which was May of 2014. That was 18 months before the arbitration. He didn't receive his second request until December of 2015, two months after the arbitration. So at the time he testified, there was radio silence from FINRA for a year and six months. So when he was asked about the status of the investigation, he stated that it was over, because that's what he believed at the time. And so far, to date, appellants have presented absolutely nothing to discredit that testimony. So to just examine the one and only document that forms the basis of their perjury claim, which is the AWC, and that is at A1584. If you examine the document, the first thing that you will note is the date on that document, which is February 26, 2016. That's four months after the arbitration. And in terms of the facts and violative conduct that's stated therein, it says that on December 15, FINRA sent a second request for an interview to Mr. Ackerman. That was two months after the arbitration. Mr. Ackerman declined to attend that interview. And as a result, it's by FINRA rules that if you decline to attend an interview, you're permanently barred from the securities market. Mr. Ackerman, who had moved to California and wasn't practicing in the securities market, declined to attend that interview in Maryland. And as a result, he consented to this bar. There's nothing in this document to shed any light on whether Mr. Ackerman knowingly lied at the time of the arbitration that either the investigation was over or that FINRA told him there was nothing improper about his trading activity. May I ask you to turn to your cross appeal and to the question of fees on a couple of different things. First, you only ask for fees in our court in your reply brief. So that probably is too late. But with respect to the fees that you're asking below that Judge Rakoff denied, do you have any New York case that says that it applies in this situation? I mean, you're relying on a very specific section of the New York law and the language of it, frankly, looks your way to run against the ordinary American rule of no fees. But do you have any New York cases that actually apply that in a situation like this arbitration? Your Honor, I've not been able to find a New York appellate division decision which interpreted section 198 of the New York labor law to say that it covered fees on appeal as well. But looking at the plain language of the law as well as the purpose of fee shifting provisions in general, which is to compensate a plaintiff and make him whole for having to bring the action. And the purpose of section 198 is to compensate an employee who had to bring a wage claim against the employer. You don't have a New York case. Are you suggesting that we should, on a question of fees, certify to the New York Court of Appeals, which will create more fees, on the question of fees? I mean, I'm big on certification and Judge Wesley almost as much as I. But should one certify fees on fees on fees or not? I'm not sure that's necessary in this case because this court can hold that just like other fee shifting statutes, and there are southern district decisions saying that under other sections, other, I'm sorry, other statutes, like the ERISA statute, and there's case law that we cited in our brief, that provides for council fees, that those fees should be awarded on appeal, as well as interpreting language in contracts. It's really no different. If a contract says that you get fees for bringing an action under the contract, it's the same concept of saying that you bring a case under the Section 198 of the New York Labor Law. But Judge Rakoff, looking at that statute, which you brought up to him, didn't read it as being that clear. Now, he couldn't certify, because in New York you can't certify from the district court. So he had to make his best guess, and his best guess on the statute was that it didn't apply. That's actually, Judge Rakoff never really discussed the statute in the context of fees. What he discussed was this court's decision in Intel Chemical Workers versus BASF Wyandotte. It's in our brief. And that case was decided under an unrelated statute. It was the National Labor's Management Act. Right, he did not think that the statute that you cited to him, because you did cite it, applied. He never even talked about it, because he didn't think it applied, and so forth, that the general rule was still the going rule, didn't he? It's definitely the case that this is an action, because the proceeding under Article 75 is considered an action in New York. The CPLR recognizes special proceedings to be the same as regular litigation. So it would seem to me that he was wrong. Well, that's our argument here, in a- That he was wrong in his understanding, excuse me. In his wrong in his understanding that this was, that the statute didn't apply. And then the question is, what does the word shall mean? Yeah. Right? I think it's clear that the statute applies. So the question is, does that statute require fees to be paid in this case or not? Well, our position is that it does, because- You think shall is clear enough? Shall is clear enough. The ordinary- He will do it, as opposed to he may do it. Certainly, the ordinary definition of the word shall is must. And so, if an employee must recover their wages in the underlying claim, there's no reason for them to recover attorney's fees for confirmation hearings, for the appeal. Because that would eviscerate, essentially, the very purpose of the statute, which is to make whole a prevailing employee. So when an employee gets their wage recovery, presumably, they can spend that entire recovery on appeals against an employer who is litigious. Thank you. Thank you. Thank you. Will you have two minutes? Thanks. I'd just like to address the standard that we are asking this court to announce when it comes to applying section 10A1 in district court actions for motions to vacate the award. As the other circuit courts have said, you do not need to establish that the outcome of the underlying matter would have been different absent the fraud. It is not an outcome determinative standard. I understand fully the issue with respect to how intertwined all of these issues are. I absolutely understand that. But the test that's been applied by all the other circuit courts said it needs to be material to an issue in the arbitration. It doesn't have to be outcome determinative. Now the only- You've been asked, have you previously been convicted of a crime in New York? And he had indeed been convicted, but he lied about it. Would that be grounds to vacate the award? Absolutely. If you look at- It would. Absolutely. So the materiality is as to the issue of credibility as opposed to the materiality as to the issues before the arbitrators. I think it's combined. I think it's both, your honor. I actually think it's both. If you look at the- Any time a witness, is this reserved for one witness cases or multiple witness cases? Any time a witness lies about their past on an issue that's not relevant to the ultimate decision but goes to their credibility, that's grounds for vacature of an award? I think certainly if it's a party, absolutely. Now in the bono- If it's a party, why would you restrict it to a party? Why wouldn't you restrict it to a witness that delivers the coup de grace with regard to the testimony? Parties are the ones who have submitted themselves to the arbitration process. They can put in witnesses, can't they? What difference does it make if the question is that it has some effect? Why should it matter whether it's a party or not? I think for parties it's actually more significant. But in the Bonnard case in the 11th circuit, that's the leading case on this. The perjury was by an expert witness who lied about his credentials, right? Now again, lying- It depended on that witness's credibility. The witness certainly testified that they thought punitive damages was supposed to be assessed in that case, right? But it didn't change the facts of the matter. They wouldn't have allowed the testimony in if they knew his true background. That was the assumption by the appellate court. The credibility didn't go to necessarily, I mean, it went to as to whether they should even consider it as opposed, of course, arbitrators, I suppose, can hear from non-expert witnesses if they so choose. And in mid-America, it was a lie by a party about the reason why he had left his post and left the safety features off at the gas plant. Those sorts of lies, we believe, are not, like the court said, social solacisms, right? Perjury has to have an impact, and it has to have an impact in a case like this. Did you have any remedy in front of the arbitrator himself, themselves? No, we didn't know about the- No, no, after you found out about it, did you have a remedy there? No, we had passed the time limit for FINRA to be able to go back to that. Thank you.  We'll reserve decision. Thank you.